275 P.2d 847

**STATE of New Mexico, Plaintiff-Appellee,**

**v.**

**Henry CARTER, Defendant-Appellant.**

**No. 5785.**

Supreme Court of New Mexico.

Oct. 27, 1954.

Easley & Quinn, Hobbs, for appellant.

Richard H. Robinson, Atty. Gen., Fred M. Standley, Walter R. Kegel, Asst. Attys. Gen., for appellee.

COMPTON, Justice.

Appellant was convicted by a jury of Lea County of having violated the provisions of § 61–1011, New Mexico Statutes Annotated, 1941 Compilation, and he appeals. The section in part reads:

"It shall be unlawful to drink or consume alcoholic liquors, or for any person who is the owner or proprietor to sell, serve, furnish or permit the drinking or consumption of alcoholic liquors in any public dance hall, pool room, bowling alley, street, state or federal building, or in any other public place except establishments having a license to dispense alcoholic liquors. * * * "

 It is first contended the court erred in admitting in evidence appellant's confession made at the time of his arrest for the reason the corpus delicti of the offense charged had not been otherwise proven. It is a well settled rule that unless the corpus delicti of the offense charged has been otherwise established, a conviction cannot be sustained solely on the extra judicial confession of an accused. In the case before us, however, the evidence proves the commission of the offense charged independent of the confession. Appellant is the owner and proprietor of a cafe in Hobbs known as Cocoanut Grove. The corpus delicti of the offense charged is knowingly permitting the consumption of intoxicating liquor by appellant in his cafe without a license to do so.

On the afternoon of October 23, 1950, two police officers, Palmer and Weathers, went to appellant's place as a routine checkup and what actually occurred at the time and place is well stated by officer Palmer and corroborated by Weathers.

By district attorney:

"Q. Mr. Palmer, tell the Court just what was taking place in this establishment at the time the arrest was made. A. Yes, sir. On the afternoon that Mr. Carter was arrested, I drove up to the front of the Cocoanut Grove Cafe, and just as I drove up outside I saw a girl rush toward the back end. I went in the front door and continued on through to the rear dining room and, just as I reached the rear dining room, I saw the girl going through another door toward the rear. She had a fellow by the hand—one hand, and he had a can of beer in the other. So I followed them on through that room, and the fellow was just setting the can of beer—just about to set the can of beer down by the bed. I told him to pick it up and come back out into the dining room—both he and the girl; I wanted to talk to them. After we came back out into the dining room, there was still another fellow at the table where this fellow had been sitting, and I talked to the fellows, and I talked to the girl. And then I called Mr. Carter. He was sitting at the front of the cafe. So when Mr. Carter came back there, I asked him why he had permitted the consumption of alcoholic beverages in this cafe which was an unlicensed establishment, because I had warned him a short while before against such

things. I had a copy of the law with me, I read it to him, and I asked him if he fully understood it. He said he did. I told him that any time in the future anybody was caught consuming any alcoholic beverages in his establishment that he would be as much in violation of the law as the people consuming it, and he would be arrested.

 \* \* \* \* \* \*

"Q. What answer did Mr. Carter make to your question?

 \* \* \* \* \* \*

"A. Well, after I asked Mr. Carter, 'Why did you permit consumption of alcoholic beverages in the cafe,' after he had been warned as to that, he said, 'Well, it's no use arguing. I just got caught.' "

 ■ The appellant, the two customers, also Pearline Stafford, the girl who was later found to be a waitress, were arrested at the time and place, and charged under the statute, after which all except appellant entered pleas of guilty. Incidentally, the beer served by the waitress was cold. Also on the outside of the building there were a lot of empty beer cans. While the presence of clearer proof would have been desirable, the facts and circumstances tend to prove that appellant had a guilty knowledge that intoxicating liquor was being consumed upon his premises. Moreover, appellant's confession being made at the time of his arrest and at the place where and when the liquor was consumed, was a part of the res gestae and for that reason was admissible. Riley v. State, 27 Ala.App. 376, 172 So. 680.

It is next argued the court erred in admitting hearsay evidence. On cross-examination by the defense, the witness Palmer was interrogated about whether he had asked another girl in the cafe if she were involved in serving the beer. To understand the claimed error fully, it will be helpful to quote the testimony at length as well as the colloquy between court and counsel.

By Mr. Quinn:

"Q. Did you ask her whether she was involved or what then? A. I don't remember the exact conversation that took place there but, after I had talked to several people and the Stafford Girl and Mr. Carter, I believe this other girl told me that she got the beer that she served to the Selby's out of the icebox in the kitchen.

"Q. Now, wait just a minute. Now, let's go back over that. What was that? A. After I talked to the Selby's and the Stafford Girl the Stafford Girl—

"Q. Now, you can't testify to that. That is a statement made by a third person and—

"The Court: You asked him, Mr. Quinn.

"Mr. Quinn: Yes, but then I asked him whether he was in this room, whether he talked to this woman.

"The Court: Very well, but you musn't invite the answers if you don't want them.

"Mr. Quinn: Yes sir, but he is attempting to get some hearsay evidence in here in answer to my question.

"The Court: All right.

"A. I'm only trying to answer your question.

"Q. Now, you talked to this other woman that was in there, is that right?

\* \* \* \* \* \*

"Q. You did take Pearline Stafford in, didn't you? A. Yes, sir. I told Mr. Carter I couldn't do that because the girl had admitted to me selling and serving the beer to the Selby's, and I couldn't do that because it wasn't right.

"Mr. Quinn: Your Honor, the admission Pearline Stafford as to what she was doing or as to what she said is an admission of a third person here, and wasn't in the presence of the defendant. I don't see how that could be introduced in evidence. Now, if they want to put the evidence on as to what Pearline Stafford said, why Pearline Stafford apparently is right down there in Hobbs where she could be brought right up here, and placed on the stand, and she could give that testimony. But it shouldn't be able to come in through this witness.

"Mr. Hanagan: If it please the Court, Mr. Quinn got it in through— by his own question. I don't think it would be *objective* at this time.

"The Court: I don't think it is objectionable. I don't know that it has much to do with the case, but he is certainly entitled to say what the defendant told him, and the defendant's statement alluded to the other girl.

\* \* \* \* \* \*

"Q. You don't know of your own knowledge that she was working there and you didn't see her sell any beer or serve any beer, is that right? A. No, sir.

"Q. And that's the reason why you were trying to ascertain whether or not the beer came out of the icebox, isn't that right? A. Is it all right, sir, if I ask a question?

"Q. Isn't that correct, Mr. Palmer? Will you please answer my question? A. There was no doubt in my mind as to where the beer came from. I was only trying to find out whether or not somebody else gave it to her with the knowledge that it was going to be served in there. The Stafford Girl had already told me that that beer came out of the icebox. I was just trying to find out whether or not the other girl gave it to her with the knowledge that it was going to be consumed there in the place.

"Mr. Quinn: Your Honor, this witness is attempting to get as much information in here as he can without any direct testimony, and he is not answering my questions directly, and I would ask the Court to ask him to answer my questions in a direct manner.

"The Court: You asked the witness whether he was trying to find out where the beer came from and he said he didn't have to find out; he already knew because the girl told him. I don't think that's an unreasonable answer to your inquiry.

"Mr. Quinn: I asked him if he hadn't asked her because he hadn't stated that he was trying to find out from this other witness if she didn't get beer out of this icebox and give it to the Stafford Girl, and I'd like to have him answer that—answer, if I might have it now.

"The Court: All right. Ask your question again."

Obviously, the answers were not altogether responsive, but no proper objection was made to the unresponsive testimony nor a ruling of the court invoked; nor did appellant move to strike it from the record. Appellant's counsel merely stated that the State was attempting to get hearsay evidence before the jury. Such general statement was not sufficient to predi-

cate error on appeal. Mitchell v. Allison, 54 N.M. 56, 213 P.2d 231. The failure to make a proper objection or move the exclusion of objectionable testimony once admitted, waives any question of error in its admission. State v. Jackson, 47 N.M. 415, 143 P.2d 875; State v. Shults, 43 N.M. 71, 85 P.2d 591; State v. Edwards, 54 N.M. 189, 217 P.2d 854; State v. Walker, 54 N.M. 302, 223 P.2d 943.

The judgment will be affirmed, and It Is So Ordered.

McGHEE, C. J., and SADLER, LUJAN, and SEYMOUR, JJ., concur.